**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**
**CENTRAL DIVISION**

| | | |
|---|---|---|
| NATIONAL ALLIANCE ON MENTAL ILLNESS OF CENTRAL MASSACHUSETTS, INC., NATIONAL ALLIANCE ON MENTAL ILLNESS OF MASSACHUSETTS, INC., and PARENT PROFESSIONAL ADVOCACY LEAGUE, INC., | ) ) ) ) ) ) ) | CIVIL ACTION NO. |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| CITY OF WORCESTER, MASSACHUSETTS, | ) ) ) | |
| Defendant. | ) ) | |

**COMPLAINT**

## I.    INTRODUCTION

1.    The National Alliance on Mental Illness of Central Massachusetts, Inc. ("NAMI Central Mass."), the National Alliance on Mental Illness of Massachusetts, Inc. ("NAMI Massachusetts"), and the Parent Professional Advocacy League, Inc. ("PPAL") include and serve thousands of children, youth, and adults with mental health disabilities, their families, professionals, and advocates who are committed to the equal and appropriate treatment of people with mental disabilities, many of whom live in Worcester, Massachusetts and rely on Worcester's 911 program when they or someone they love experience a mental health emergency.

2.    The City of Worcester ("City" or "Worcester") operates a unified 911 program, which responds to, among others, calls for health emergencies, including both physical and mental health emergencies.

3.     When Worcester residents suffer a physical health emergency, such as a heart attack, calling 911 brings qualified health responders, including Emergency Medical Technicians (EMTs) and Paramedics.  These health care professionals respond promptly and are qualified to provide the core functions of an emergency health response—conduct assessments, de-escalate and stabilize the individual's condition, provide critical medical interventions, and refer and, where needed, transport the child, youth, or adult to an appropriate health program.

4.     In contrast, when Worcester residents experience a mental health emergency, such as suicidal ideation or post-traumatic stress episodes, the City's default response to a 911 call is to send armed police officers who are not qualified to perform the core functions of an emergency mental health response.  Instead, their qualifications and training prepare them for maintaining public order, ensuring public safety, and promoting prompt compliance from the public.  These tasks involve skills that are antithetical to clinically resolving mental health emergencies.

5.     In addition, armed police, by their presence alone, can escalate individuals in a mental health crisis.  According to the International Association of Chiefs of Police, "the mere presence of a law enforcement vehicle, an officer in uniform, and/or a weapon . . . has the potential to escalate a situation" when the person is in crisis.[1]  Accordingly, police responses to those emergencies frequently produce unintended harmful results, including physical injury or trauma, avoidable involuntary detention, and/or unnecessary arrest for children, youth, and adults with mental health disabilities.  As a result, many individuals with mental illness and their families avoid seeking assistance from 911 during mental health emergencies.

---

[1] Amos Irwin & Betsy Pearl, Ctr. for Am. Progress, *The Community Responder Model: How Cities Can Send the Right Responder to Every 911 Call* 5 (Oct. 2020) (quoting IACP Law Enforcement Policy Ctr., *Responding to Persons Experiencing a Mental Health Crisis* (2018)), https://www.americanprogress.org/wp-content/uploads/sites/2/2020/10/Alternatives911-report.pdf.

6.      Most physical and mental health emergencies reported to the City's 911 program are non-violent, non-criminal offenses that do not require an armed police response.  Nevertheless, children, youth, and adults in need of assistance with a mental health emergency receive a vastly different response than people in need of assistance with physical health emergencies.  The policies and procedures of the City's 911 program specifically categorize and treat *all* mental health emergency calls as requiring a police response, including those involving children and youth.  Pursuant to those policies and procedures, the City's 911 program's default is to dispatch armed police instead of qualified health responders.

7.      Police officers are not qualified mental health providers.  They lack the training and qualifications to provide appropriate de-escalation, assessment, and interventions that children, youth, and adults with mental health disabilities need in a mental health emergency.  Further, sending armed police officers to respond to people with mental health disabilities during a mental health emergency can — and often does — result in involuntary confinement, use of force and/or arrest.  Indeed, the Worcester Police Department's "Emergency Mental Health Procedures" expressly limit officers' responses to persons with mental health disabilities to arrest, involuntary commitment, or being "transported to the appropriate mental health facility . . . "[2]

8.      People with mental health disabilities who interact with the police are more often unnecessarily subjected to involuntary emergency detention and held for evaluation at a hospital, in part because police do not have the expertise to evaluate a person in a mental health crisis, because the primary purpose of law enforcement is to ensure public safety, not to provide mental health treatment, and because the mere presence of armed officers may worsen the individual's mental health crisis.

[2] Worcester Police, Policy and Procedure No. 830, Emergency Mental Health Procedures 4-5, 6, 8 (Oct. 24, 2011), https://public.powerdms.com/WorcesterPolice/documents/1515627.

9.     A law enforcement response to a mental health crisis can result in the use of a broad spectrum of force on people with mental health disabilities, from unnecessary physical restraint to injury and, in tragic circumstances, the loss of life. Research has shown that people with mental health disabilities are nearly twelve times more likely to experience use of force by police than people without such disabilities.[3]

10.    Children, youth, and adults who experience mental health emergencies in Worcester should not have to face the heightened risk of violence, involuntary confinement, or arrest by police in response to 911 calls seeking help.

11.    The City has acknowledged the value of and need for qualified mental health providers to respond to 911 calls in a mental health emergency.  In 2023, the City created a pilot Mental Health Crisis Response Team that was affiliated with a Community Behavioral Health Center, supervised by mental health clinicians, and staffed by mental health providers with lived experience who were trained in behavioral health response.  This program was intended to be an unarmed, professional response to people who called 911 for themselves or for another, because they or someone they knew were experiencing a mental health emergency.

12.    However, Worcester's pilot Mental Health Crisis Response Team responded to very few 911 calls because the City only operated, staffed, and funded the team for limited hours each day. Moreover, in the majority of those 911 calls, the Mental Health Crisis Response Team was called only after police had initially responded and intervened, still providing a first response by armed police to the mental health emergency rather than an appropriate mental health response. This meant that the trained mental health clinicians were not able or available to promptly assess,

---

[3] Ayobami Laniyonu & Phillip Atiba Goff, *Measuring Disparities in Police Use of Force and Injury Among Persons with Serious Mental Illness*, 21:500 BMC Psychiatry 1, 6 (2021), https://bmcpsychiatry.biomedcentral.com/articles/10.1186/s12888-021-03510-w.

de-escalate, stabilize, and provide urgent mental health interventions. The Mental Health Crisis Response Team was very rarely dispatched as the first and sole responder to a mental health emergency, as EMTs usually are in a physical health emergency.

13.    The City operated the Mental Health Crisis Response Team pilot for less than 18 months and disbanded this pilot for reasons wholly unrelated to the effectiveness or appropriateness of dispatching mental health professionals to mental health emergencies. The City currently has no equivalent professional clinical response to mental health emergencies.

14.    Worcester fails to provide an unarmed and qualified mental health response to children, youth, and adults who experience mental health emergencies, in contrast to the City's response to those who have a physical health emergency. Through this policy and practice, the City discriminates on the basis of disability by denying children, youth, and adults with mental health disabilities an equal opportunity to benefit from its 911 program's emergency health responses, by denying them equal access to necessary services from its 911 program, and by failing to make reasonable modifications necessary to afford them an equal opportunity to participate in its 911 program.

15.    Plaintiffs bring this case on behalf of themselves and their members and constituents, who are discriminated against by the City's 911 program because of disability, in violation of Title II of the ADA, 42 U.S.C. §§ 12131-12134, and Section 504, 29 U.S.C. § 794.

## II.    JURISDICTION AND VENUE

16.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

17.    This Court has jurisdiction to grant both declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

18.     Venue is proper in the District of Massachusetts under 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2) because Defendant is located there and substantially all the events or omissions giving rise to the claims occurred there. Venue is proper in the Central Division under District of Massachusetts Local Rule 40.1(d)(1)(B) because all the parties are located in the District of Massachusetts and the majority of the plaintiffs are located in this Division.

## III.    PARTIES

### A.    *Plaintiffs*

#### 1.    *NAMI Central Mass., Inc.*

19.     The National Alliance for Mental Illness of Central Massachusetts (incorporated as NAMI Central Mass., Inc.) is a mental health organization based in Worcester and comprised of families whose members have mental illness.  NAMI Central Mass.'s mission is to improve the quality of life for people with mental illness and their families through support, education, and advocacy, and to eliminate the stigma surrounding mental illness.  Its Board of Directors includes members whose family members have often experienced a mental health emergency and who may need to call Worcester's 911 emergency response program.  NAMI Central Mass.'s core business activities include holding regularly scheduled support groups and classes for parents and families of persons with mental illness, as well as responding to individual requests for information and assistance—especially information and assistance about whom to call when someone experiences a mental health emergency—from families in Worcester whose members have mental illness.

20.     NAMI Central Mass.'s members and constituents include Worcester families that have called 911 when their family member experiences a mental health crisis.  However, when families receive a police response to a mental health crisis instead of mental health clinicians or

peers, their experience has been that their child or family member receives no timely mental health support, is involuntarily committed or told to go to the emergency room, and/or is arrested.

21.    NAMI Central Mass. brings this action on behalf of itself and its members and constituents who are and have been substantially and directly injured by the City's discriminatory administration and operation of its 911 program.  The City's actions, as described herein, have frustrated NAMI Central Mass.'s mission, have forced NAMI Central Mass. to reallocate resources to assist or support its constituents during mental health emergencies, and have undermined the effectiveness of support, services, and assistance it provides to families of individuals with mental illness.

### 2.    *National Alliance on Mental Illness of Massachusetts, Inc.*

22.    NAMI Massachusetts is a nonprofit grassroots organization that seeks to improve the quality of life for people living with mental health conditions, their families, and their caregivers.  NAMI Massachusetts has over 1,000 volunteers, members and constituents across Massachusetts, including in Worcester.

23.    NAMI Massachusetts's core business activities include:  peer support and education programs for individuals with mental illness; family support and education programs for family members, friends, partners, and other caregivers of people with mental illness; community education and outreach to first responders, educators, and others; policy development, program development, and advocacy with public officials, legislators, other disability organizations, professional associations, and stakeholders concerning the strengths, needs, and services for people with mental illness, including mobile crisis services and alternative response programs to respond to mental health emergencies; and a helpline that provides resources and support to help

people navigate the mental health system and problem solve in difficult circumstances, including whether to call 911 during mental health emergencies.

24.    NAMI Massachusetts' core business activities also include, and have for decades included, extensive policy and legislative advocacy work in Massachusetts to combat and mitigate the harm and injury to people with mental illness caused when cities, including Worcester, dispatch armed police officers in response to 911 mental health emergency calls.  NAMI Massachusetts is considered one of the Commonwealth's leading authorities on diverting people with mental health disabilities from the criminal justice system and has partnered with numerous state and local governments and agencies in initiatives designed to prevent the unnecessary arrest and detention of people with mental health disabilities.  NAMI Massachusetts's longstanding policy and advocacy work to ensure safe, clinically appropriate responses for individuals experiencing mental health emergencies has been undermined and rendered less effective by Worcester's discriminatory policy and practice of dispatching armed police officers to mental health emergencies and has required NAMI Massachusetts to divert staff time and other resources from supporting people with mental health disabilities who are experiencing mental health emergencies.

25.    NAMI Massachusetts's education, policy, advocacy, and outreach activities include recruiting and training volunteers who have mental illness, as well as family members of individuals with mental illness, to participate in trainings on mental health crisis intervention with police departments, hospitals, schools, universities, and mental health provider agencies across Massachusetts, including in Worcester.  NAMI Massachusetts was one of the first organizations in Massachusetts to initiate education and training to improve first responses to mental health emergencies.  The purpose and goal of these trainings and outreach are to ensure the safety and well-being of people with mental illness when they experience mental health emergencies, as well

as the effectiveness of the services and supports provided to people with mental illness in response to these emergencies. In undertaking this work, NAMI Massachusetts devotes considerable time, energy, and resources to improving public programs that respond to mental health emergencies, including 911 programs and alternative response programs that rely on mental health professionals and peers to address mental health emergencies. The time, energy, and resources NAMI Massachusetts has had to devote to these activities has been increased, complicated, and even compromised by Worcester's discriminatory 911 program.

26.    NAMI Massachusetts's training activities in Worcester include participating in approximately three-to-four crisis intervention trainings per year at the City's 911 center. These trainings are open to and intended to assist Worcester police officers in responding to mental health emergencies. NAMI Massachusetts also conducts and participates in trainings in other parts of the Commonwealth that are open to Worcester police officers. These trainings, and the resources NAMI Massachusetts devotes to them, have informed NAMI Massachusetts's policy advocacy on the most appropriate programs and practices to respond to mental health emergencies.

27.    As a result of Worcester's discriminatory policy and practice of dispatching armed police officers to mental health emergencies, NAMI Massachusetts has had to modify how it prepares volunteer family and peer trainers to address specific issues, concerns, and challenges that arise from the City's use of armed officers to respond to 911 mental health emergency calls. Furthermore, the City's discriminatory policy and practice of dispatching armed officers, instead of clinically appropriate mental health professionals, to mental health emergency calls has undermined, and continues to undermine, the purpose and goal of NAMI Massachusetts's presentations to police, hospitals, mental health agencies, and other entities in Worcester, namely,

to protect and ensure the safety and well-being of persons with mental illness who seek or receive assistance during mental health emergencies.

28.    In addition, as a direct and proximate result of Worcester's discriminatory policy and practice of dispatching armed officers to mental health emergencies, NAMI Massachusetts has been forced to divert its limited resources for criminal justice diversion to crisis intervention training for City of Worcester police officers to mitigate and counteract the discriminatory impact of Worcester's policy and practice on people with mental health disabilities. NAMI Massachusetts would have otherwise used these resources to, among other things, provide increased support through its helpline to persons with mental illness and/or their families, friends, or caregivers who need assistance, support and advice getting help with behavioral health issues.

29.    NAMI Massachusetts brings this action on behalf of itself and its members and constituents who are and have been substantially and directly injured by the City's discriminatory administration and operation of its 911 program. The City's actions, as described herein, have frustrated NAMI Massachusetts's mission, have forced NAMI Massachusetts to reallocate resources to assist or support its constituents during mental health emergencies, have required NAMI to revise and expand its advocacy and policy programs to focus on strategies to improve mental health emergency response systems, and have undermined the effectiveness of supports, services, assistance programs, and other core business activities intended to assist and benefit individuals with mental health disabilities, their families, and caregivers.

### 3.    *Parent/Professional Advocacy League, Inc.*

30.    PPAL is a Massachusetts grassroots family organization, based in Worcester County, that works on behalf of children, youth and young adults with mental health disabilities and their families. Founded in 1991, PPAL's mission is to improve the mental health and well-

being of children, youth and families through education, advocacy and partnership. In furtherance of this mission, PPAL works directly with children, youth, and young adults with mental illness up to age 26, both in Worcester and throughout Massachusetts.

31.     PPAL is a family-run organization in which over 50% of the board and staff have lived experience as individuals or family members of children, youth, and young adults with mental health disabilities. From July 2024 to June 2025, PPAL supported over 150 children and/or families in Worcester, many of whom have called and/or are likely to call 911 in a mental health emergency.

32.     PPAL's core business activities include family support through one-on-one meetings, group support, training, and educational programming. Through family support staff, they provide connections to community services, referrals, training and skill building for families and youth. They also provide support and skill building for families of children and youth with behavioral health conditions to assist them in working with state and local agencies, schools, 911 programs, police, and courts.

33.     PPAL's constituents include families in the City of Worcester that have called 911 when their family member experiences a mental health emergency. However, when families receive a police response to a mental health emergency instead of mental health clinicians or peers, their experience has been that their child either receives no timely mental health support, is involuntarily committed or told to go to the emergency room, and/or is arrested for children 12 and older, due to the limitations and negative impacts of the police response. Many families lose trust and avoid calling 911 even when their child is experiencing a mental health emergency and needs assistance. As a result, many of these families contact PPAL more frequently for assistance

in mental health emergencies and, accordingly, consume even more of PPAL's limited resources to respond to or support them during mental health emergencies.

34.     PPAL provides support directly to children, youth, and young adults in Worcester who are experiencing mental health emergencies and their families.  Because the City's 911 program only dispatches armed officers in response to individuals experiencing mental health emergencies, PPAL must often refrain from referring its constituents in Worcester to 911, which would otherwise be an important resource for PPAL and its constituents. At other times, PPAL has been forced to provide specific instructions to children, youth, and young adults with mental illness and their families on how to avoid additional trauma and injury when using 911, such as by requesting an ambulance or that responding officers not activate sirens on their squad cars. This advice is often not effective in avoiding an armed response and the resulting injury and trauma to children, youth, and young adults experiencing mental health emergencies. As a result, PPAL's support for children, youth, and young adults with mental illness and their families has been undermined and made less effective by the City's discriminatory actions.

35.     PPAL brings this action on behalf of itself and its constituents who are and have been substantially and directly injured by the City's discriminatory administration and operation of its 911 program.  The City's actions, as described herein, have frustrated PPAL's mission, have forced PPAL to reallocate resources to assist or support its constituents during mental health emergencies, and undermined the effectiveness of support, services, and assistance it provides to children, youth, and young adults with mental health disabilities and their families.  The City's discriminatory 911 program has compromised PPAL's efforts to secure appropriate mental health services for children, youth, and young adults with mental illness and their families; support, improve and enhance the independence and self-advocacy of PPAL's constituents; and provide

support and referrals to children, youth, and young adults with mental illness and their families in mental health crises.

### B. Defendant

36.    Defendant City of Worcester is a municipal corporation that is organized under the laws of the Commonwealth of Massachusetts and has the capacity to sue and be sued. The City is a "public entity" within the meaning of Title II of the ADA, 42 U.S.C. § 12131(1), and receives federal financial assistance within the meaning of Section 504, 29 U.S.C. § 794(a).

37.    The City operates a unified 911 program that receives and responds to all requests for emergency assistance, including calls and requests for physical and mental health emergencies, within the City of Worcester. The City operates the 911 program, including calls for health emergencies, through the Worcester Emergency Communications Department, the Worcester Police Department, the Worcester Fire Department, and by contracting for services with Worcester Emergency Medical Services.

## IV.    STATEMENT OF FACTS

### A. *The ADA and Section 504 Require that People with Disabilities Have Equal Access to, and an Equal Opportunity to Benefit From, the Services, Programs, and Activities of a Public Entity's 911 Program, Including by Making Reasonable Modifications to a Public Entity's 911 Program.*

38.    Under Title II of the ADA, the City may not, in providing vital services through its 911 program, including, specifically, its response to calls for emergency health assistance, discriminate against qualified persons with disabilities, including those with mental health disabilities, or deny people with mental health disabilities equal access to, or the equal benefits and services of, the 911 program.  42 U.S.C. § 12132.

39.    Congress specifically authorized the U.S. Department of Justice (DOJ) to issue regulations implementing Title II's non-discrimination requirements. 42 U.S.C. § 12134(a).

Furthermore, in enacting the ADA, Congress expressly incorporated the legal standards set forth in Section 504 and its regulations. 42 U.S.C. § 12201(a) (stating that "nothing in this chapter shall be construed to apply a lesser standard than the standards applied under [Section 504] or the regulations issued by Federal agencies pursuant to such title.").

40.     As applied to the City's 911 program, Title II and Section 504 require, *inter alia*, that the City ensure that:

a.     People with mental health disabilities have an equal opportunity to use and benefit from the City's 911 program as the general public, *see* 28 C.F.R. § 35.130(b)(1)(ii) & 28 C.F.R. § 41.51(b)(1)(ii);

b.     People with mental health disabilities have an equal opportunity to obtain the same level and type of services and assistance, designed and capable of effectively fulfilling their core functions, from the City's 911 program as the general public, *see* 28 C.F.R. § 35.130(b)(1)(iii) & 28 C.F.R. § 41.51(b)(1)(iii);

c.     The City has made reasonable modifications in the policies, practices, and procedures of its 911 program to avoid discrimination based on disability, *see* 28 C.F.R. § 35.130(b)(7)(i) & 42 U.S.C. § 12101(a)(5); *see also Alexander v. Choate*, 469 U.S. 287, 301 (1985) (holding that Section 504 requires "reasonable accommodations in the grantee's program or benefit" for qualified persons with disabilities); and

d.     The City does not "utilize criteria or methods of administration" that have the "purpose or effect of defeating or substantially impairing accomplishment of the objectives of" the 911 program "with respect to individuals with disabilities[.]" *See* 28 C.F.R. § 35.130(b)(3)(ii); *see also* 28 C.F.R. § 41.51(b)(3)(ii).

**B.     The Purpose and Design of a 911 Program Is to Promptly, Effectively and Appropriately Respond to Emergencies, Including All Physical and Mental Health Emergencies.**

41.     The City's 911 program is intended to provide timely and appropriate responses to calls and requests for emergency assistance.  The 911 program receives and evaluates calls for assistance, determines the appropriate response, and dispatches police, fire, or emergency health services, including in response to calls for both physical and mental health emergencies.  The City's Emergency Communications Department ("Emergency Communications") administers and operates the 911 program.

42.     The mission of the City's 911 program is to "enhance the quality of life of every person in Worcester by receiving and processing 911 emergency calls and non-emergency calls by dispatching the appropriate emergency responder units in a prompt, efficient, courteous and professional manner, to help save lives, protect property and assist the public."[4]

43.     The core functions and promised benefits of the City's 911 program is to provide a timely and appropriate response to a request for emergency assistance.  For all health emergencies, the 911 program's essential activities are to: (1) promptly respond to all health emergency calls; (2) immediately assess the situation and individual's health condition; (3) de-escalate and stabilize the condition; (4) provide emergency health interventions as needed; and (5) refer the individual to a health program or facility, including transport to that site if necessary.

**C.     The City's 911 Program, Which Responds to Both Physical and Mental Health Emergencies, Is a Single, Unified Program.**

44.     The City's 911 program, like other 911 programs, answers calls for all types of emergencies, including both physical and mental health emergencies.  The 911 program must

---

[4] *See* https://www.worcesterma.gov/emergency-communications (last visited March 4, 2026).

obtain information about the nature and location of the emergency, classify and prioritize the call, refer to the appropriate responder, and document the call and the response. A 911 program may include multiple components that operate as an integrated, coordinated, and unified single program.

45.    Nationally, 911 emergency calls are routed through Public Safety Answering Points (PSAP). In Massachusetts, a PSAP is defined as "a facility assigned the responsibility of receiving 911 calls and, as appropriate, directly dispatching emergency response services or transferring or relaying emergency 911 calls to other public or private safety agencies or other PSAPs." M.G.L. c. 6A, § 18A.

46.    PSAPs develop policies and procedures for classifying and coding calls in order to dispatch the appropriate resources. Telecommunicators who process 911 calls are tasked with making decisions based on the information they receive, including the seriousness and the nature of the emergency, how quickly the response is needed, and who is the appropriate responder.

47.    As the City department that administers and operates the City's 911 program, Emergency Communications is the City's primary PSAP.[5]    In this role, Emergency Communications responds to approximately 140,000 calls per year. For each of these calls, Emergency Communications is responsible for triaging and dispatching the appropriate emergency response. Emergency Communications decides, based on the information it receives and City procedures and guidelines, the type of responder to send to each emergency call, including calls for both physical and mental health emergencies.

48.    The City's 911 program, which includes its response to calls for physical and mental health emergencies, is a single, unified program for the purposes of the ADA and Section 504.

---

[5] *See* 560 Mass. Code Regs. § 5.03 (a "Primary PSAP . . . is the first point of reception of a 911 call.").

### D.    Mental Health Emergencies Typically Arise from Mental Health Disabilities and Do Not Pose Public Safety Risks.

49.    Mental health disabilities are conditions that affect a person's thinking, perception, feeling, behavior and/or mood.  Common mental health disabilities include anxiety, depression, panic disorder, and post-traumatic stress disorder (PTSD).  Most children, youth, and adults who contact 911 in a mental health emergency, or who are the subject of such calls, have a mental health disability that substantially limits one or more major life activities like thinking, concentrating, communicating, or caring for oneself.

50.    Typical mental health emergencies, including those involving thoughts of hopelessness, suicide, or self-harm, do not present a risk of danger to others.  If there is a risk of danger involved in having suicidal feelings or thoughts, it is to the person experiencing the crisis, a crisis which cannot typically be prevented by a police response.

51.    People with mental health disabilities are often wrongly perceived to be more dangerous and more likely to commit crimes than others.  For example, the City's own Emergency Mental Health Procedures describe the "unpredictable and sometimes violent nature of the mentally ill" and informs responding officers that "[d]ealing with individuals who are known or suspected to be mentally ill is always difficult as it carries the potential for violence" and may lead to "civil litigation."[6]   In fact, a survey of epidemiological studies concluded that the "overwhelming majority of people with mental illness are not violent and the majority of people who are violent do not have identifiable mental illness."[7]   Research and data confirm that people

---

[6] Worcester Emergency Mental Health Procedures, *supra* note 2, at 2.
[7] John S. Rozel and Edward P. Mulvey, *The Link Between Mental Illness and Firearm Violence: Implications for Social Policy and Clinical Practice,* 13 Annual. Rev. Clinical Psych. 445, 448 (2017), https://www.annualreviews.org/docserver/fulltext/clinpsy/13/1/annurev-clinpsy-021815-093459.pdf?expires=1773069940&id=id&accname=guest&checksum=95EB8B2D58D90448E5C6E7AF60AA7D62.

with mental health disabilities are much more likely to be victims than perpetrators of violent crime.[8] Despite this reality, children, youth, and adults with mental health disabilities often suffer from stigma surrounding their disability and experience discrimination.

52.    The social stigma associated with mental health disabilities contributes to how people with mental health disabilities are seen and treated.  This stigma leads to discrimination in numerous aspects of the lives of people with mental health disabilities, including housing, education, and employment.  The U.S. Surgeon General's first national report on mental illness, issued in 1999, found that "[f]or too long the fear of mental illness has been profoundly destructive to people's lives . . . resulting in lost opportunities for individuals to seek treatment and improve or recover."[9] The stigma surrounding mental health disabilities for children and youth is equally devastating, resulting in bullying, decreased self-esteem, social exclusion, isolation and shame.[10]

53.    Despite the fact that people with mental health disabilities are no more likely than the general population to be a danger to others, the City responds to 911 mental health emergencies as they would to people accused of committing crimes — namely, by automatically dispatching armed police officers instead of appropriate mental health responders.

E.    *Mental Health Experts Agree that Police Officers Should Not Respond to Typical Mental Health Emergencies.*

54.    Both nationally and in Massachusetts, reports and studies have confirmed that sending armed police officers to respond to mental health emergencies is clinically inappropriate and often causes harm to the individual.  In 2021, the Massachusetts Legislature commissioned a

---

[8] Linda A. Teplin *et al.*, *Crime Victimization in Adults with Severe Mental Illness: Comparison with the National Crime Victimization Survey*, Arch. Gen. Psychiatry 911, 917 (2005), https://scispace.com/pdf/crime-victimization-in-adults-with-severe-mental-illness-432ms7wwgk.pdf.
[9] U.S. Dep't of Health & Hum. Servs., *Mental Health: A Report of the Surgeon General* (1999), Message from Donna E. Shalala, Secretary of Health and Human Services, https://ia903202.us.archive.org/12/items/mentalhealthrepo00unit/mentalhealthrepo00unit.pdf.
[10] World Health Org., *Mental Health of Adolescents* (Sept. 1, 2025), https://www.who.int/news-room/fact-sheets/detail/adolescent-mental-health.

study to investigate diverting 911 mental health calls from police to unarmed responders. The *Massachusetts 911 Call Study*, a report produced through a collaboration between the Executive Office of Health and Human Services (EOHHS) and Executive Office of Public Safety and Security (EOPSS), noted:

> A system in which law enforcement is the default responder to an individual experiencing a behavioral health crisis increases the potential of avoidable adverse outcomes for the subject, such as being arrested, involuntarily hospitalized, traumatized, or subjected to harm. These adverse outcomes disproportionately impact Black, Indigenous, and people of color (BIPOC).[11]

55.     The Substance Abuse and Mental Health Services Administration (SAMHSA) of the U.S. Department of Health and Human Services (HHS) has issued national guidance on providing a community-based response to mental health crises, and in doing so, recognized "the potential harm and stigma associated with police involvement in behavioral health crises."[12] Under these guidelines, SAMHSA has stated that in "the absence of sufficient and well-integrated mental health crisis care," making "local law enforcement the *de facto* mental health mobile crisis system" is "unacceptable and unsafe."[13]

56.     Additionally, SAMHSA's *National Guidelines for Child and Youth Behavioral Crisis Care* describe the harms that can result from police response to mental health emergencies for children and youth, noting that "[p]olice involvement in crisis situations can provoke fear, anxiety, and trauma response or re-traumatization, particularly among Black, Indigenous, and other

---

[11] Exec. Off. of Health & Hum. Servs. & Exec. Off. of Pub. Safety & Sec., *Massachusetts 911 Call Study: Assessing the Potential to Divert Behavioral Health Calls to Alternative Responses* 5-6 (June 30, 2023), https://www.mass.gov/doc/massachusetts-911-call-study-0/download.

[12] U.S. Dep't of Health & Hum. Servs., Substance Abuse & Mental Health Servs. Admin., *2025 National Guidelines for a Behavioral Health Coordinated System of Crisis Care* 36 (Jan. 15, 2025), https://988crisissystemshelp.samhsa.gov/sites/default/files/2025-04/national-guidelines-crisis-care-pep24-01-037.pdf.

[13] U.S. Dep't of Health & Hum. Servs, Substance Abuse & Mental Health Servs. Admin., *National Guidelines for Behavioral Health Crisis Care Best Practice Toolkit* 33 (2020), https://bja.ojp.gov/sites/g/files/xyckuh186/files/media/document/samsha-national-guidelines.pdf.

People of Color (BIPOC) youth and families and those in low-income, segregated communities."[14] When schools call 911 for students experiencing a mental health emergency, police are most likely the default responders. Where the police are called to respond to disruptive behavior in classrooms students often experience arrest, disproportionate punishment, and referral to the courts.[15]

57.    Finally, SAMHSA's 2025 guidelines for behavioral health crisis response state that:

> Communities that already face disparities in access to services and resources may be further marginalized through primary law enforcement response to behavioral health crisis and extended stays in emergency departments (EDs). Crisis responders may refer individuals in crisis to psychiatric inpatient services when they may have better outcomes in less restrictive and more inclusive community-based services.[16]

58.    DOJ and HHS have also issued joint guidance to states and municipalities on complying with federal disability rights law when interacting with, and responding to, people with mental health disabilities.  Recognizing that interactions between law enforcement and people with mental health disabilities can be "harmful and potentially deadly for people with disabilities," the guidance affirms that ADA protections apply to 911 programs:

> Equal opportunity requires that people with behavioral health disabilities receive a health response in circumstances where others would receive a health response–for example, if call centers would dispatch an ambulance or a medic rather than law enforcement to respond to a person experiencing a heart attack or a diabetic crisis, equal opportunity would entail dispatching a health response in similar circumstances involving a person with a behavioral health disability.[17]

---

[14] U.S. Dep't of Health & Hum. Servs., Substance Abuse & Mental Health Servs. Admin., *National Guidelines for Child and Youth Behavioral Health Crisis Care* 13 (2022), https://zerosuicide.edc.org/sites/default/files/2024-04/pep-22-01-02-001.pdf.
[15] *Id*. at 13-14.
[16] *National Guidelines for a Behavioral Health Coordinated System of Crisis Care*, *supra* note 12, at 4.
[17] U.S. Dep't of Justice & US. Dep't of Health and Hum. Servs., *Guidance for Emergency Responses to People with Behavioral Health or Other Disabilities* 3-4 (May 2023), https://www.justice.gov/d9/2023-05/Sec.%2014%28a%29%20-%20DOJ%20and%20HHS%20Guidance%20on%20Emergency%20Responses%20to%20Individuals%20with%20Behavioral%20Health%20or%20Other%20Disabilities_FINAL.pdf (last visited Feb. 25, 2026).

59.     Additionally, following investigations into municipal police and 911 programs, DOJ has found that cities violate the ADA when their 911 program defaults to providing a police response to people with mental health disabilities who experience a mental health emergency.[18]

60.     The National Alliance on Mental Illness, a national non-profit organization that serves people with mental health disabilities and their families and is the parent organization to the Plaintiffs NAMI Central Mass. and NAMI Massachusetts, has also long supported the use of mobile crisis teams, finding that "people experiencing a mental health emergency deserve quick access to effective mental health care – just as people expect when experiencing physical health emergencies."[19]

### 1.     Police Are Not Appropriate or Effective Mental Health Responders.

61.     People with mental health disabilities are entitled to a safe, appropriate and non-discriminatory emergency health response in the same way and to the same extent that the general public receives.  When armed law enforcement officers are the sole or primary responders to mental health emergencies, there is an increased risk of escalation, trauma and injuries, as well as increased likelihood of arrest, incarceration and death, with even higher risks for people of color.[20]

62.     People with mental health disabilities experience significant disparities in police use of force.  They are almost twelve times more likely to experience use of force by the police and ten times more likely to experience injury from the force used by police.[21]  One study found

---

[18] *See, e.g.,* U.S. Dep't of Justice, Civil Rights Div., *Investigation of the City of Minneapolis and the Minneapolis Police Department* 57-66 (June 16, 2023), https://www.justice.gov/opa/press-release/file/1587661/dl (last visited Mar. 5, 2026); U.S. Dep't of Justice, Civil Rights Div., *Investigation of the City of Phoenix and the Phoenix Police Department* 87-100 (June 13, 2024), https://www.justice.gov/crt/media/1355866/dl?inline (last visited Mar. 5, 2026).
[19] Hannah Wesolowski, Nat'l Alliance on Mental Illness, *Mobile Crisis Teams:  Providing an Alternative to Law Enforcement for Mental Health Crises* (July 13, 2022), https://www.nami.org/blog/mobile-crisis-teams-providing-an-alternative-to-law-enforcement-for-mental-health-crises/.
[20] *See* Esther Anene, M.S. *et al.*, *Revisiting Research Safety Protocols: The Urgency for Alternatives to Law Enforcement in Crisis Intervention*, 74:3 Psychiatric Servs. 325, 325-26 (Mar. 2023), https://psychiatryonline.org/doi/epdf/10.1176/appi.ps.20220084.
[21] Laniyonu & Goff, *supra* note 3, at 6.

that one in five fatal police shooting victims may have been experiencing a mental health crisis at the time of their death.[22]  More than two-thirds of people with mental health disabilities who were shot by police suffered fatal injuries.[23]

63.     People with mental health disabilities are much more likely to be arrested than the general public.[24]  Youth with mental health disabilities are also much more likely to interact with police than the general public, resulting in disproportionately high rates of youth with mental health disabilities incarcerated in juvenile facilities.[25]

64.     Children and youth with mental health disabilities are more likely to exhibit behaviors that lead police to escalate, rather than calm, children and youth who are in crisis.  This may result in increased trauma for children and youth who are already vulnerable and in crisis.  As stated by the American Psychiatric Association in its Position Statement on Police Interactions with Children and Adolescents in Mental Health Crisis:

> Children and adolescents are less able to anticipate consequences and to self-regulate their emotions as compared to adults. As the level of resistance increases, officers use higher levels of force to gain compliance. Black children are six times, and Hispanic children three times more likely to be shot to death by police than white children. The police use of force against children and adolescents who are acting in developmentally appropriate ways can lead to acute distress, which can be harmful to a child's ability to cope and may lead to a cascade of psychological sequelae. This may include the development or worsening of mental illness and can

---

[22] Harun Khan *et al.*, *Fatal Police Shootings of Victims with Mental Health Crises:  A Descriptive Analysis of Data from the 2014-2015 National Violent Death Reporting System*, 101 J. Urban Health 262 (2024), https://pmc.ncbi.nlm.nih.gov/articles/PMC11052937/pdf/11524_2024_Article_833.pdf.

[23] Julie A. Ward *et al.*, *National Burden of Injury and Deaths From Shootings by Police in the United States, 2015–2020,* 114 Am. J. Pub. Health 387, 390 (2024), https://ajph.aphapublications.org/doi/epdf/10.2105/AJPH.2023.307560.

[24] William H. Fisher & Lorna Simon *et al.*, *Risk of Arrest Among Public Mental Health Services Recipients and the General Public*, 62:1 Psychiatric Servs. 67, 68 (Jan. 2011), https://psychiatryonline.org/doi/epdf/10.1176/ps.62.1.pss6201_0067.

[25] Seena Fazel & Helen Doll *et al.*, *Mental Disorders Among Adolescents in Juvenile Detention and Correctional Facilities: A Systematic Review and Metaregression Analysis of 25 Surveys*, 47:9 J. Am. Acad. Child Adolescent Psychiatry 1010, 1016 (Sept. 2008).

end in traumatization, serious injury, lower educational attainment and future employment, or death.[26]

> **2.     *Mobile Crisis Teams and Alternative Response Programs Are Appropriate and Effective Mental Health Responders to 911 Emergency Mental Health Calls.***

65.     Mobile crisis teams and alternative response programs are the professionally accepted and clinically effective method for responding to mental health crises.  Mobile crisis teams offer: "1) triage and screening to determine the most appropriate response; 2) assessments; 3) de-escalation and crisis resolution; 4) peer support; 5) coordination with mental health and medical services as appropriate; and 6) crisis planning and follow-up."[27]

66.     Key elements for mobile crisis staff training and qualifications include the appropriate professional training and clinical competence to understand the needs and conditions of the children, youth, and adults served, acceptance and promotion of recovery and resilience, and the ability to create individualized, person-centered plans to address the immediate crisis.

67.     SAMHSA considers mobile crisis response teams to be essential in responding to mental health emergency response calls.[28]  Mobile crisis response teams are one of SAMHSA's three "core components" for meeting the needs of individuals in a behavioral health crisis.[29]

68.      "Mobile crisis teams are trained to successfully de-escalate situations, diverting people from arrest and incarceration, or hospitalization."[30]  Mobile crisis teams and alternative

---

[26] Am. Psychiatric Ass'n, *Position Statement on Police Interactions with Children and Adolescents in Mental Health Crisis* (May 2022), https://www.psychiatry.org/getattachment/085c5817-87e3-4fd9-8885-ed1d83ec7266/Position-Police-Interactions-with-Children-Adolescents-in-Crisis.pdf#:~:text=The%20police%20use%20of%20force%20against%20children,lead%20to%20a%20cascade%20of%20psychological%20sequelae.

[27] Int'l Ass'n of Chiefs of Police, *Assessing the Impact of Mobile Crisis Teams: A Review of Research—Executive Summary* i, https://www.theiacp.org/sites/default/files/IDD/Review%20of%20Mobile%20Crisis%20Team%20Evaluations.pdf.

[28] *National Guidelines for a Behavioral Health Coordinated System of Crisis Care, supra* note 12, at 35, 36.

[29] *National Guidelines for Child and Youth Behavioral Health Crisis Care, supra* note 14, at 8.

[30] Legal Defense Fund & Bazelon Ctr. for Mental Health Law, *Community-Based Services for Black People with Mental Illness:  Advancing an Alternative to Police* 15 (Jan. 2023), https://www.naacpldf.org/wp-content/uploads/2023-LDF-Bazelon-brief-Community-Based-Services-for-MH48.pdf.

response programs are known to be necessary and effective when responding to a mental health crisis.

### 3. *Worcester's Emergency Communications Department Receives, Codes, and Triages 911 Health Emergency Calls.*

69.    Emergency Communications receives and evaluates all 911 emergency calls for the City of Worcester.  It dispatches the responders from Worcester's Police Department and Fire Department to emergencies.  Emergency Communications received over 140,000 calls in 2024, the third largest number of calls in Massachusetts.[31]

70.    Emergency Communications makes all dispatch decisions for both physical and mental health emergencies.  Based upon its assessment of the information and situation, it determines which calls are physical health emergencies and which calls are mental health emergencies.  It transfers all physical health emergency calls to Worcester Emergency Medical Services (WEMS), the agency contracted by the City to manage Emergency Medical Dispatch as part of its 911 program.  WEMS, in turn, dispatches EMTs and paramedics. For mental health emergency calls, Emergency Communications dispatches armed police.  Thus, Emergency Communications dispatches qualified and trained health responders to physical health emergencies but not for mental health emergencies.

71.    All health emergency calls to Emergency Communications, including for both physical and mental health emergencies, are initially answered by telecommunicators who gather information about the health emergency, classify the call, assign a code, and determine the type of emergency health response that will be dispatched. Emergency Communications provides training and supervision for telecommunicators, along with policies and protocols for intake, coding and classification, data entry, and dispatch.

---

[31] *See* https://www.mass.gov/doc/calendar-year-2024-call-volume/download (last visited Mar. 5, 2026).

72.     Based on whether the telecommunicators determine if a health emergency call is properly classified as a physical health emergency or a mental health emergency, the process for dispatch and response drastically differs.  These differences are reflected in dispatch certifications, staff qualifications and training, and responder protocols.

**a.      The City's Dispatchers for Physical Health Emergencies Have<br>Specialized Training and Protocols for Health Emergencies.**

73.     All physical health emergency 911 calls are transferred by telecommunicators to Emergency Medical Dispatchers, who must be trained and certified to handle medical dispatch. *See* 560 Mass. Code Regs. § 5.05(1).

74.     Emergency Medical Dispatchers must be certified as 911 telecommunicators and are required to complete an additional 32 hours of training, as well as pass a certification examination.

75.     When Emergency Medical Dispatchers are on the line with callers, they are guided by detailed, statewide treatment protocols, which include:

> a protocol for emergency medical dispatcher response to calls, including structured caller questioning for patient condition, incident facts, and scene safety, pre-arrival instructions, post-dispatch instructions, selection of appropriate field resources to dispatch (such as first responder, basic life support, and/or advanced life support), and a continuous quality assurance program that measures compliance with the protocol through ongoing random case review of each emergency medical dispatcher.

560 Mass. Code. Regs. § 5.03.

76.     Emergency Medical Dispatchers must:

(a) use a single, Department-approved Emergency Medical Dispatch Protocol Reference System [EMDPRS] on every request for medical assistance, unless exigent circumstances prohibit such use; (b) have in place policies and procedures for the safe and effective use of the Department-approved EMDPRS; (c) provide pre-arrival instructions; and (d) provide dispatch life support in compliance with the written text of scripts and other processes within a Department-approved EMDPRS.

25

560 Mass. Code. Regs. § 5.05(2).

77.     Notwithstanding that they are tasked with assessing a mental health emergency and providing an appropriate and effective response, the City's 911 telecommunicators, who are not Emergency Medical Dispatchers, do not receive similar training for responding to mental health emergencies.  Nor are there standard protocols for mental health emergencies, such as those that exist for physical health emergencies.  There are no standard reference system and relevant requirements for mental health emergencies.  As a result, the City's telecommunicators who respond to and evaluate mental health emergency calls receive minimal training on handling, coding and processing mental health emergency calls, and lack the structured protocols used by Emergency Medical Dispatchers.

> **b.     Despite Handling Thousands of Mental Health Emergency Calls, Emergency Communications Provides Limited Guidance for Intake and Classification of Mental Health Emergency Calls.**

78.     Emergency Communications typically uses the code "Check on the Welfare" for mental health emergencies.[32]  The City responds to thousands of these calls every year.[33]   The vast majority of these calls, including for mental health emergencies, do not involve violence or criminal activity.  Nevertheless, the City dispatches armed police officers to 100% of these calls.[34]  In almost all these calls, armed officers are the *only* responders.  In a few cases, Emergency Communications dispatched ambulances in addition to armed officers, but this occurred in less than six percent of "Check on the Welfare" calls during 2024.[35]

---

[32] *See* Worcester Emergency Commc'ns, *Incident Codes – Data Definitions* 2 (2024) (stating that "Check on the Welfare" is the code "[t]ypically used for all mental health related calls.)."
[33] Worcester Department of Emergency Communications, *Worcester Police Department Incident Logs* (2023-2024).
[34] *Id.*
[35] *Id.*

79.    During a 2022 meeting of the Worcester Human Rights Commission, Worcester Deputy Police Chief Edward McGinn Jr. estimated that "upwards of 25% [of] calls on a daily basis are people who are experiencing some sort of mental health crisis.  We are the epicenter of all things social service here in Worcester."[36]  Based on Emergency Communications' reported intakes for 2024, that would represent at least 35,000 mental health calls per year.

80.    As the City itself has recognized, many individuals with mental health disabilities have multiple, repeated interactions with the City's 911 program and are likely to have them again. For example, in a May 5, 2023 grant application to the Massachusetts Department of Mental Health (DMH), the City wrote that it would collect data identifying "'super utilizers' of the 911 system secondary to mental health, substance use and/or social determinant needs."  Additionally, in an April 23, 2024 funding request to DMH, the City wrote that it would review its police response "to persons and places demonstrating repeated mental health-related issues," including "those most frequently arrested" and whether "future arrests can be deterred by alternative courses of action."

81.    Mental health emergency calls are not coded as medical or even health-related unless the individual is also experiencing a physical emergency.  As a result, such calls are not transferred to Emergency Medical Dispatch for clinical evaluation and response.

82.    Emergency Communications has no specific intake procedures for mental health emergencies.  There is no behavioral health specialist employed by Emergency Communications who can triage calls or provide specialized intake for mental health emergency calls.  There are no intake questions or protocols that are used for answering mental health emergency calls, despite the fact that Emergency Communications receives thousands of mental health emergency calls per year.

---

[36] City of Worcester, Human Rights Comm'n, Minutes 8 (July 11, 2022).

### 4.     Worcester's 911 Program Dispatches Qualified and Trained Health Care Professionals in Physical Health Emergencies.

83.     As is required for the City's Emergency Medical Dispatchers, there are significant training and certification requirements for the City's physical health first responders – the emergency medical technicians (EMT) and paramedics.  There are three levels of physical health emergency training in Massachusetts: EMT-Basic, Advanced EMT, and Paramedic.  Each level of certification requires a competency-based proficiency in required skills and knowledge.

84.     The EMT-Basic certification requires 160 hours of training.  The overall objective of an EMT is to provide pre-hospital care and transportation in emergencies.  They receive training in patient assessment, medical and trauma emergencies, CPR, and bleeding control, among other topics.  The core functions of an EMT Basic are to assess the requirements for emergency medical care, administer the appropriate care to the individual based on that assessment, minimize discomfort and prevent injury during transport, and perform all functions safely and effectively.[37] The Advanced EMT certification requires up to 200 hours of training, and includes all of the elements of EMT Basic, as well as advanced skills training.

85.     Paramedics require approximately 1200 to 1800 hours of instruction.  Paramedics can provide advanced levels of care, including advanced life support, are trained in complex procedures, and work alongside EMTs to provide emergency medical care.  Paramedic training programs can last approximately sixteen months, and EMT certification is a prerequisite for entry into a paramedic program.

---

[37] U.S. Dep't of Transp., Nat'l Highway Traffic Safety Admin., *EMT-Basic: National Standard Curriculum* 3 (1994), https://rosap.ntl.bts.gov/view/dot/12549.

     **5.**     ***Worcester's 911 Program Primarily Dispatches Armed Police Officers Who Are Not Qualified Mental Health Responders to Mental Health Emergencies.***

86.     In contrast with the City's policies and practices for emergency physical health calls, the City's 911 program does not dispatch qualified, trained, or certified mental health professionals for calls involving mental health emergencies.  Instead, the default responders for people with disabilities who are experiencing mental health emergencies are armed officers in the Worcester Police Department.

87.     While EMTs and paramedics are primarily trained in emergency health response, police officers are primarily trained in law enforcement.  Basic training for new recruits in Massachusetts is 20 weeks.[38]  The curriculum emphasizes investigation and patrol procedures, including courses on the use of force, incident command, crowd management, and homeland security.  There is just one course listed during the 20 weeks of mandatory training dealing with mental health emergencies, entitled "Response to Individuals in Crisis."[39]  While Massachusetts police officers are required to complete 40 hours (online) of additional training per year, there is no requirement that this include mental health training, except for one course related to police officers' own mental health.

88.     Crisis intervention training is a 40-hour training program sponsored by Massachusetts DMH and delivered by community-based providers for law enforcement officers in Massachusetts.  The training is voluntary for both new recruits and established officers—there is no requirement that law enforcement officers participate in the training. Fewer than 100

---

[38] *See* Commw. of Mass., Mun. Police Training Comm., https://www.mass.gov/info-details/mptc-full-time-police-academies#:~:text=Successful%20completion%20of%20the%20recruit,on%20the%20following%20core%20principles (last visited Mar. 5, 2026).

[39] Commw. of Mass., Mun. Police Training Comm., *Recruit Officer Course Curriculum Overview* 2 (Version C2024, 2024).

Worcester police officers (which is less than 25% of the Worcester police force) have participated in this training.[40] Even for police officers who elect to participate in crisis intervention training, there are no standardized protocols or any targeted dispatch of these officers to mental health emergencies by Worcester's Emergency Communications. In addition, the training is focused entirely on teaching police officers about general mental health issues and is fundamentally different from the qualifications and training required of a mental health professional.

89.     Moreover, the Worcester Police Department has no departmental policies requiring that officers who have undergone crisis intervention training respond to mental health emergencies. Likewise, the City has no policies or procedures requiring Emergency Communications to dispatch officers trained in crisis intervention as a first responder to mental health emergencies.

90.     Crisis intervention training does not, cannot, and is not intended to provide law enforcement with the skills, education, qualifications and training required to provide the core benefits of the 911 program's emergency health response to people who have mental health emergencies, namely, conducting assessments, de-escalating and stabilizing the child, youth or adult's condition, and providing referrals and, where needed, transporting them to an appropriate health program.

91.     Separately from this training, Worcester has a grant-funded Crisis Intervention Team, which is comprised of four police officers and two behavioral health clinicians. Worcester Police Chief Paul B. Saucier, in a report to the Worcester City Council's Standing Committee on Public Safety, noted that the City relies on this team to provide a behavioral health response.[41]

---

[40] City of Worcester, *Summary Report of Worcester Police Department's Current and Ongoing Practices Relative to Department of Justice Investigation* (Apr. 16, 2025), https://www.worcesterma.gov/police/press-releases/summary-report-worcester-police-departments-current-and-ongoing-practices.
[41] Worcester City Council, Standing Comm. on Pub. Safety Hr'g at 18:00—18:50 (Apr. 15, 2025), https://play.champds.com/worcesterma/event/2707.

However, this team does not typically respond to 911 mental health emergency calls. Instead, it follows up on individuals only after armed officers have responded to the individual's mental health emergency. This follow-up response can take days to over a week to occur. Furthermore, the team typically spends little time with the individual and provides little to no on-site mental health treatment, services, support or referrals. Instead, the team typically determines whether the child, youth or adult requires or qualifies for involuntary commitment or hospitalization.

92.    Countless individuals have suffered disability discrimination because the City failed to provide a response to mental health emergencies equivalent to that provided to physical emergencies. Just a few examples follow:

a.    Staff of a homeless shelter in Worcester frequently called 911 for assistance for a resident who, due to her mental illness, was refusing to eat, talk, or leave her living space. The shelter's rules prohibited residents from carrying weapons or using drugs or alcohol on the premises, thereby rendering the need for an armed response unlikely. In their 911 calls, staff explained that a resident needed immediate mental health assistance. The City nevertheless dispatched only armed officers, who were unable to assist with the resident's mental health emergency.

b.    Shelter staff also called 911 when a resident was experiencing a mental health emergency that appeared to be the result of post-traumatic stress disorder. Staff reported that the resident was in an agitated state but was not attacking or threatening other residents. Two armed officers arrived and stood over the man for approximately 30 minutes until an ambulance arrived to transport the man to the hospital. During this time, the officers did not—and indeed could not—offer any

professionally-appropriate intervention to help stabilize the resident's mental state and perhaps avoid involuntary hospitalization.

c.  A Worcester resident called 911 over 20 times between January and October 2024 whenever he believed he needed immediate assistance for a mental health emergency.  In most cases, armed officers responded and called an ambulance to transport him to the hospital.  In other cases, officers requested that the individual be involuntarily committed in accordance with M.G.L. c. 123, § 12 based on perceived danger to himself or others, even though officers knew this individual and did not perceive him as dangerous.  One officer wrote that he had been to the individual's house at least twelve times over a period of approximately six weeks and asked that the incident "be tagged CIT" so that the Crisis Intervention Team would be "aware" of this individual.  Crisis Intervention Team members visited this individual approximately three times over this period but did little more than evaluate whether the individual met the criteria for involuntary commitment.

d.  Another Worcester resident with mental illness who was the subject of repeated 911 mental health emergency calls reported feeling humiliated and traumatized when she perceived that the responding officers were mocking her, not taking her seriously, or considered her a nuisance.  When she was hospitalized, the responding officers failed to ensure she had her medications or inform hospital staff of her need for medication.  Officers also at times transported the woman to the hospital without her glasses, shoes, a coat, or a change of clothing.  The woman had previously been a member of the Massachusetts National Guard, had gone to college, and had been gainfully employed.

**6.    *Worcester Police Policies, Training and Protocols***

93.    Police presence, training and procedures often directly conflict with the type of training and methods that would be used by mental health professionals responding to a mental health emergency.  In the first instance, simply encountering a police officer can be traumatic for a person in mental health emergency.  As noted above, the International Association of Chiefs of Police has stated that "the mere presence of a law enforcement vehicle, an officer in uniform, and/or a weapon . . . has the potential to escalate a situation" when the person is in crisis.[42]

94.    Police training and protocols emphasize using their authority as police officers to control situations to which they respond.  They use verbal orders, strategic positioning, and may appear in tactical gear, often with the back-up of several police cars with lights and sirens.  Much of their training focuses on defensive tactics, firearms training, and the use of force, including the many weapons other than firearms that they may carry and are able to deploy.  Police training has a "heavy emphasis on physical and technical skills, such as the use of firearms…"[43]

95.    Many police departments, including the Worcester Police Department, have adopted the use of force continuum, which divides subjects into levels from level one to level five. The level of force considered reasonable increases as the amount of "resistance" or "defiance" increases.[44]  Compliance techniques for a person whose "non-compliance has increased in scope and intensity and now includes energy enhanced physical or mechanical defiance … in establishing, achieving and/or maintaining a posture of resistance" include the following: front

---

[42] Amos Irwin & Betsy Pearl, *supra* note 1.

[43] Council on Crim. Justice, *Task Force Calls for Overhaul of U.S. Police Training, National Standards to Reduce Use of Force* (Mar. 25, 2021), https://counciloncj.org/task-force-calls-for-overhaul-of-u-s-police-training-national-standards-to-reduce-use-of-force/.

[44] Worcester Police Dep't, Policy & Procedure No. 400, Use of Physical Force & Use of Deadly Force 9 (June 2, 2022), https://public.powerdms.com/WorcesterPolice/documents/1524389.

wrist lock, finger grasp, rear wrist lock, arm bar, bent wrist lock, take down, pressure points, triceps pinch, pepper spray, taser and stun drive mode.[45]

96.    These tactics are not dependent on whether a crime is being or has been committed, or even the level of crime suspected, but solely to the level of resistance to police commands.  The tactics are used to exert control over a person and situation, and when used during a mental health emergency, can — and often do — exacerbate and potentially injure a person who is not able to understand commands or to comply with an officer's commands.  As the National Alliance on Mental Illness has found, "Interactions between law enforcement and people with mental illness often escalate and can even be deadly – often because the person in a mental health crisis may have symptoms that appear threatening or impact their ability to listen to police commands."[46]

97.    The Worcester Police Department's Emergency Mental Health Procedures ("EMH Procedures") govern the conduct of police when responding to persons with mental health disabilities, and those experiencing "emotional disturbances."  These procedures almost exclusively require officers to respond to calls involving people with mental health disabilities through arrest, civil commitment, or "transporting" them to other "facilities."  Nowhere do these procedures contemplate addressing an individual's mental health emergency during the incident itself by dispatching mental health professionals (as the City would for medical emergencies involving physical health).  The procedures also describe "individuals who are known or suspected to be mentally ill" as having "the potential for violence" and an "unpredictable and sometimes violent nature," against which officers should "never compromise or jeopardize their safety or the safety of others . . . ."[47]  In short, the procedures mandate that officers treat most or all people who

---

[45] *Id.*
[46] Nat'l Alliance on Mental Illness, *Police Use of Force*, https://www.nami.org/advocacy-at-nami/policy-positions/stopping-harmful-practices/police-use-of-force/ (last visited Mar. 5, 2026).
[47] Worcester Emergency Mental Health Procedures, *supra* note 2, at 2.

have—or whom the officer merely suspects to have—mental health disabilities as presumptively violent and dangerous. This is a recipe for inflicting unnecessary force, injury, and trauma on people with mental health disabilities, due to their disabilities.

98. There are numerous examples of cases in which an armed police response resulted in injury, trauma, or escalation of an individual's mental health crisis, including:

a. Last year, three officers responded to a 911 call by a mother who needed assistance with her 14-year-old son, who was acting aggressively towards her due to his mental health disability and autism. At the time of the officers' arrival, the boy had locked himself in his bedroom. After a few attempts to communicate with the boy, one of the officers kicked open the bedroom door, after which all three officers physically restrained the boy for several minutes, maneuvering him from the bed to the floor and holding his head down while handcuffing his hands behind his back. The touching and handcuffing caused the boy to scream and cry for over 20 minutes, which significantly worsened his mental health crisis. At one point, one of the officers commented, "He's triggered by our presence," and left the bedroom in an apparent attempt to de-escalate the situation. However, another armed officer remained in the room, and the boy kept crying and pleading with the officers to remove the handcuffs. The officers did not do so until the boy's mother was able to intervene and convince the boy to leave his bedroom to go to the hospital. The boy was then strapped and restrained onto the ambulance stretcher.

b. Two officers responded to a call a mother placed to 911 for "medical attention" after her 10-year son, who has a mental health disability and autism, became agitated in their car during a school drop-off. After the boy refused to engage with

the officers and threw a bag of potato chips on the ground, the officers grabbed the boy by his arm, pulled him out of the car, and restrained him face-down on the ground, including by placing their knee on the boy's neck, until an ambulance arrived to transport the boy to the hospital. During this time, the officers noted that the boy was "visibly upset and crying." The officers' intervention significantly worsened the boy's mental health crisis and fractured his arm.

c. DOJ's recent investigation into the Worcester Police Department also uncovered the following instances in which police responded with unnecessary force to mental health emergencies:

> For example, in the process of taking a 26-year-old man exhibiting mental health symptoms to the hospital, officers punched the man in the face twice. Officers conducted a welfare check after the man repeatedly called 911, making confusing comments that indicated potentially delusional thinking. When officers arrived, they concluded he was experiencing a mental health crisis and radioed to dispatch about starting a mental health evaluation. Upon hearing this, the man ran back into his apartment. Two officers followed him. The man used his hand to push off an officer's chest while trying to run into another room, striking but not injuring the officer. An officer pushed the man down onto a couch. When the man stood up, the officer punched him in the face twice, even though the man was unarmed and clearly exhibiting behaviors consistent with a mental health disability, and even though there were three officers present who could have worked together to control the man without resorting to head strikes. The officers then used additional force while handcuffing him. These officers had received training on intervening with people in crisis, but still struck the man in the head unreasonably.

> In another incident, a WPD officer pepper sprayed a handcuffed, suicidal man in the face. The WPD officers who responded to the call knew the man had made suicidal comments but was not suspected of any arrestable offense. The officers put the man in handcuffs, placed him on a stretcher, and waited for emergency medical responders to arrive to transport him to the hospital. When the man learned that he was going to the hospital, he began kicking and fell off the stretcher and later elbowed and attempted to head

butt officers. Without reporting that they provided a warning, an officer sprayed the man's face with pepper spray and placed him back on the stretcher. This use of force was unreasonable because officers and multiple paramedics at the scene outnumbered the man, had already handcuffed him, and should have attempted hands-on techniques to further restrain him before resorting to pepper spray.[48]

d.    Finally, video footage of an incident captured by a bystander in July 2020 shows a Worcester police officer striking a man with mental health disabilities who was strapped to a gurney prior to being placed in an ambulance for transport to a mental health facility.  Three officers surrounded the man while the incident occurred.[49]

99.    The assertion that there are numerous persons with mental health disabilities that police may come into to contact with who are potentially dangerous and violent, in conjunction with the EMH Procedures' admonition that these interactions require "special police skills and abilities" to avoid "unnecessary violence and potential civil litigation," sets the tone for how the City's police respond to mental health emergency calls, and further exacerbates the often tenuous relationship between standard police functions and an appropriate mental health emergency response.[50]

100.    At a meeting of the City's Human Rights Commission on April 28, 2025, Liz O'Callahan, the Commission's then-Vice-Chair, noted that "the current policy may inadvertently reinforce existing stereotypes and stigma associated with behavioral health challenges," noting that "individuals diagnosed with a mental health disorder are statistically far more likely to be a

---

[48] U.S. Dep't of Justice, *Investigation of the Worcester Police Department and the City of Worcester, Massachusetts* 11 (Dec. 9, 2024), https://www.justice.gov/crt/media/1378896/dl (last visited Mar. 5, 2026).
[49] Steven H. Foskett, Jr., *Internal Investigation: Worcester officer used reasonable force in Main Street confrontation caught on video*, Worcester Telegram & Gazette (Mar. 19, 2021, at 3:38 PM ET), https://www.telegram.com/story/news/2021/03/19/worcester-police-say-officer-used-reasonable-force-july-incident/4766406001/.  *See also* https://www.youtube.com/shorts/wxtURqcEeXA (last visited Mar. 4, 2026).
[50] Worcester Emergency Mental Health Procedures, *supra* note 2, at 2.

victim of a crime than to pose a danger to others." She noted "the importance of acknowledging this fact to help prevent negative implicit biases impacting officer responses."[51]

101.    Worcester's EMH Procedures authorize and even encourage the use of involuntary detention and hospitalization when responding to people in a mental health emergency, noting that "police officers are granted broad authority with these individuals pursuant to MGL Ch. 123 §12."[52]

102.    Massachusetts law authorizes the emergency restraint, transport and hospitalization of a person where an authorized mental health clinician or physician has a reasonable belief that failure to hospitalize a person would create a likelihood of serious harm to himself or others by reason of mental illness.  *See* M.G.L. c. 123, §12.   In an emergency, a police officer is allowed to file an application for involuntary commitment if an authorized mental health clinician is not available.  There is no age limitation for involuntary commitment applications – they can be filed on children, youth, or adults.

103.    When police officers respond to a mental health emergency, they must rely on their judgment and experience as a law enforcement officer in place of a clinical determination as to whether the person meets the clinical criteria for emergency detention and should be involuntarily restrained and transported to the hospital for a mental health evaluation.   This results in unnecessary involuntary detention applications.

104.    Worcester Police Department policies and practices result in the unnecessary restraint and hospitalization of children, youth, and adults with mental health disabilities, even though the vast majority of people who are detained under an application for involuntary commitment are later determined *not* to be a danger to themselves or others and are released back

---

[51] City of Worcester, Human Rights Comm'n, Hybrid Meeting Minutes 8 (Apr. 28, 2025).
[52] Worcester Emergency Mental Health Procedures, *supra* note 2, at 2.

into the community.  In Massachusetts in 2022, over 70 percent of people brought to the hospital under involuntary commitment applications were released without being transferred to a psychiatric hospital for further care and treatment.[53]  Likewise, in Worcester, many, if not most, of the individuals referred for involuntary commitment are found not to be a danger to themselves or others and are returned to the community, where they continue to utilize or be the subject of 911 calls for mental health emergencies.

105.    Unlike a person who voluntarily goes to the hospital emergency department for treatment, when police officers file an application for involuntary commitment, the person is searched, handcuffed, and transported via police patrol wagon or ambulance, as required by Worcester Police Department policy.  Persons transported by ambulance may be restrained with straps around their chest, knees, and ankles, which almost completely restrict any movement.

106.    Under Massachusetts law, "any person who transports a mentally ill person to or from a facility for [involuntary commitment] shall not use any restraint that is unnecessary for the safety of the person being transported or other persons likely to come in contact with the person." M.G.L. c. 123, § 21.  Notwithstanding this provision, the Worcester Police Department Emergency Mental Health Procedures states that for persons referred for involuntary commitment, "restraint during transport is *virtually always warranted*."[54]

107.    Additionally, a person who is transported to a hospital for involuntary commitment is deemed to be in custody and cannot leave the hospital until they are evaluated and released by the hospital after an initial evaluation.

---

[53] *See* Mass. Dep't of Mental Health, *Final Report on the Impact of Chapter 249 of the Acts of 2000: An Act to Reform the Civil Commitment Process for Persons with Mental Illness: 2022 Annual Report* 8 (2022), https://www.mass.gov/doc/2022-dmh-civil-commitment-annual-report/download.
[54] Worcester Emergency Mental Health Procedures, *supra* note 2, at 7 (emphasis added).

108.     Being placed into custody for involuntary commitment is similar in process to being arrested for a crime.  For a person experiencing a mental health emergency, this process is often traumatic, including the initial restraint by police, any further restraint during ambulance transport, and then at the hospital.  It can, and often does, result in their being forcibly medicated with chemical restraints.  During emergency detentions, people may lose their jobs or housing and experience other harms, including isolation from family and friends and seclusion within the hospital.  Nationally, emergency rooms have been flooded with psychiatric patients, including in Massachusetts where the percentage of patients who are boarding — *i.e.*, those who are in emergency departments for more than twelve hours — has reached almost 40 percent.[55]

109.     Unlike people who experience mental health emergencies, people who experience physical health emergencies are not placed at risk of losing their liberty and freedom through involuntary hospitalization and treatment as a result of having sought and/or received assistance through the City's 911 program.  People with a mental health emergency experience distinct and serious harms when they are placed in custody, restrained, and involuntarily transported to a hospital, including the increased risk of suicide, reinforcement of stigma around treatment, and loss of personal agency, and autonomy.[56]  For youth, this leads to a sense of "being treated as if they had committed a crime or done something wrong rather than experienced distress or mental health challenges outside of their control."[57]  These injuries and harms are the direct result of the City's discriminatory treatment of people with mental health disabilities in its 911 program.

---

[55] Craig LeMoult, *More Behavioral Health Patients Are Being 'Boarded' in Mass. Emergency Departments*, GBH News (Feb. 27, 2025), https://www.wgbh.org/news/health/2025-02-27/more-behavioral-health-patients-are-being-boarded-in-mass-emergency-departments.

[56] *See* Nev Jones *et al.*, *Investigating the impact of involuntary psychiatric hospitalization on youth and young adult trust and help-seeking in pathways to care,* 56(11) Soc. Psychiatry Psychiatric Epidemiology, author manuscript 2-3 (Nov. 2021), https://pmc.ncbi.nlm.nih.gov/articles/PMC10105343/pdf/nihms-1889895.pdf.

[57] Nev Jones *et al.*, *Youths' and Young Adults' Experiences of Police Involvement During Initiation of Involuntary Psychiatric Holds and Transport*, 73:8 Psychiatric Servs. 910, 912 (Aug. 2022), https://psychiatryonline.org/doi/epdf/10.1176/appi.ps.202100263.

110.    None of the City's policies, procedures, or practices provides for mental health professionals to be first responders to mental health emergency calls, even for the thousands of calls that are non-criminal in nature.  Instead, the City's procedures establish armed law enforcement as the default response to mental health emergencies.  Where an individual is in police custody, whether criminal or civil in nature, the City's procedures require that the individual be restrained, through handcuffs and potentially leg shackles, if determined to be necessary within the officer's discretion.  These policies and procedures result in children, youth, and adults with mental health disabilities routinely being involuntarily restrained and unnecessarily admitted to the emergency department for evaluation and potentially civil commitment.

111.    Not only are there no on-site assessments, triage, emergency treatment, and referral for ongoing care by a mental health professional on the scene under the City's current protocols, there is an increased risk of the use of force, as illustrated by the previous examples.  This is distinctly different from the emergency health response to a physical health emergency.  As a result, the City has failed to provide meaningful access and reasonable accommodations and modifications to its 911 program by failing to provide qualified and appropriate mental health professionals to respond to mental health emergencies, in violation of the ADA and Section 504.

### F.    *Worcester Has Long Acknowledged the Deficiencies and Harmful Consequences of its 911 Program's Emergency Health Response to Mental Health Emergencies.*

112.    The City has known for years that its failure to send trained mental health professionals to respond to people with mental health disabilities who experience mental health emergencies led to worse outcomes for these individuals.  The City has identified hundreds of mental health cases in their Massachusetts DMH diversion grant applications as needing a response from a mental health professional.  In a 2023 application, the City noted that "the rate at which

WPD [Worcester Police Department] personnel interact with persons with mental health disorders exceeds the national [average of] 7% level by a high margin."[58]

113.    More than four years ago, the Worcester City Council passed a resolution to explore models that would send an alternative response team to mental health emergencies.  In response to the resolution, the City's Department of Health and Human Services engaged a team of Worcester Polytechnic Institute representatives to "produce a set of recommendations for the city of Worcester, MA in their effort to establish a Crisis Response Team."[59]  With data provided by the Worcester Police Department, the team found that over 17,000 calls per year could be responded to by a mental health crisis response team of mental health professionals, similar to the EMS team that responds to physical health emergencies.[60]

114.    The City's Mental Health Task Force assembled a group to focus on crisis intervention.  This group, which included community members, City officials, and the Worcester Police Department, developed a clinical model for response to 911 mental health emergency calls "to have clinicians respond to some crisis responses in lieu of other public safety response, as well as obtain assistance from clinicians to help assist our City's 9-1-1 center to reduce call influx for mental health and substance use calls . . ."[61]

115.    In May 2022, the City selected Community Healthlink, a large mental health provider agency, to provide crisis response services.  This initiative was funded and launched by

---

[58] Worcester Police Dep't, *Application for Massachusetts Department of Mental Health Jail/Arrest Diversion Grant* (May 5, 2023).
[59] Owen Buckingham, Anthony Galgono & Meenakshi Kodali, Worcester Polytechnic Inst., *Creating a Crisis Response Team* vii (2021), https://digital.wpi.edu/pdfviewer/ms35tc41v.
[60] *See id.* at 9.
[61] Dr. Matilde Castiel, Comm'r of Health and Human Servs., *Community Healthlink and Community Crisis Response Model, Memo to the City Council of the City of Worcester* (Apr. 12, 2022).

the City as a pilot on a limited basis in July 2023.[62]  Worcester City Councilor Sarai Rivera said

that the crisis response model will let police "focus on public safety, and the folks that are trained

in crisis intervention can work on the crisis."[63]

116.    In describing the pilot program, Worcester Deputy Police Chief McGinn noted that

after the George Floyd murder, the Worcester Police Department wanted a program that would

respond to people in "emergent" and "acute" situations for people experiencing a mental health

emergency.[64]  He noted that "typically, an officer goes," but when there is a clear case that an

officer is not needed, the clinicians could respond.[65]  He explained, "[t]he beauty of this program

is that it allows the clinician to be right out there and assess the person right out there on the

street."[66]  Deputy Chief McGinn further explained that this program would be different from the

Crisis Intervention Team, which usually follows up on referrals from police.[67]

117.    However, the resulting pilot, because it was limited in time, place, and resources

for its short, one and one-half year duration, failed to provide meaningful alternative responses to

people with mental health disabilities and produced little, if any, diversion of 911 mental health

emergency calls.  As a result, there is currently no professional clinical health response for 911

mental health emergency calls.

118.    As required by the ADA and Section 504, the City can, and must, make reasonable

accommodations and modifications to its 911 program.  Providing a clinical response, using

---

[62] Tréa Lavery, "Mental Health Crisis Response Pilot Program Launched in Worcester," MassLive.com (July 5, 2023), https://www.masslive.com/worcester/2023/07/mental-health-crisis-response-pilot-program-launched-in-worcester.html.
[63] Neal McNamara, "Worcester Police Crisis Response Program Starting in June, City Says," Patch (Mar. 22, 2023), https://patch.com/massachusetts/worcester/worcester-police-crisis-response-program-starting-june-city-says.
[64] Worcester Police Department Civilian Academy-Week 7, at 1:20-6:24 (YouTube, Jan. 10, 2024), https://www.youtube.com/watch?v=ht1b0XzEh6w&list=PL3TD3ySXewEz0iXMan9pIlQxLmiSwpTu1&index=7.
[65] *Id*. at 4:32-40.
[66] *Id*. at 4:50-56.
[67] *Id*. at 5:41-6:04.

trained mental health professionals, to mental health emergencies in the same manner and extent that the City provides a clinical response with trained medical professionals to physical health emergencies, is necessary to achieve the purposes of the unified 911 program and its response to health emergencies; less harmful to people who seek help from that program; and more consistent with professional standards and research on emergency response than the City's current practice of relying on armed law enforcement personnel. Such modification is also more responsive to the needs and preferences of the local community, and particularly people with disabilities and their families in Worcester; prevents the harms of unnecessary involuntary commitment applications and arrest; and is more cost effective, given the clinical benefits of responding to mental health emergencies with qualified mental health professionals.

119.    Plaintiffs have no adequate remedy at law and are suffering and will continue to suffer irreparable injury from the City's unlawful discrimination, thus rendering equitable relief appropriate.

## V.    CLAIMS FOR RELIEF

### CLAIM I

### Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131-12134

*(Discrimination on the Basis of Disability by a Public Entity)*

120.    Plaintiffs reallege and incorporate by reference the allegations set forth in each foregoing and succeeding paragraph as though fully set forth herein.

121.    Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

122.    In enacting the ADA, Congress recognized that "discrimination against individuals with disabilities continue[s] to be a serious and pervasive social problem" in "such critical areas as . . . health services . . . and access to public services. . .." 42 U.S.C. § 12101(a)(2)-(3).

123.    The purpose of the ADA is "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). The ADA's protections extend to all aspects of a public entity's activities, including its 911 program.

107.    The City of Worcester is a "public entity" as defined by Title II of the ADA. 42 U.S.C. § 12131(1).

108.    The City's 911 program is a single service, program or activity operated by, funded by, and directed by the City, and is subject to the anti-discrimination mandate of Title II of the ADA.

108.    The term "disability" includes a "mental impairment that substantially limits one or more major life activities," including major bodily functions, 42 U.S.C. § 12102(1)(A) & (2)(B), as well as "a record of such impairment" or "being regarded as having such an impairment," 42 U.S.C. § 12102(1)(B)-(C).  Episodic impairments are covered by the ADA under 42 U.S.C. § 12102(4)(D), and the determination of whether an impairment substantially limits a major life activity is made "without regard to the ameliorative effects of mitigating measures such as—(I) medication[.]" 42 U.S.C. § 12102(4)(E)(i).  The definition of disability "shall be construed in favor of broad coverage…to the maximum extent permitted . . ." 42 U.S.C. § 12102(4)(A).

109.    Plaintiffs' members and constituents are "qualified individual[s] with a disability" within the meaning of Title II of the ADA. 42 U.S.C. §§ 12102, 12131(2).  These individuals have, or have a record of having, mental health impairments such as anxiety, depression, autism, PTSD,

or behavioral disorders. These impairments, particularly during a mental health emergency, substantially limit these individuals' ability to perform multiple major life activities, including communicating, interacting with others, and caring for themselves. These individuals, like all other residents of Worcester, are able to contact Worcester's 911 program, or have others contact that program on their behalf, and request emergency assistance. Accordingly, they are qualified to receive the benefits of this program.

110.    The City, through its 911 program, discriminates based on disability, in violation of Title II of the ADA, 42 U.S.C. § 12132, as follows:

a.    *First*, the City's 911 program employs an unequal and ineffective emergency response that discriminates against people with mental health disabilities. The City's policy, practice and procedures are to respond to calls for physical health emergencies by sending paramedics and EMTs who are trained and equipped to provide an adequate health emergency response, while, by contrast, responding to mental health emergencies by sending armed police officers who are not qualified mental health professionals capable of providing on-site mental health assessment, stabilization, emergency treatment, and referral to individuals experiencing a mental health crisis. The City's discriminatory actions have resulted in, and continue to result in, ineffective, unequal, inappropriate, and even harmful emergency interventions for people with mental illness, including escalations and exacerbations of mental health crises, unnecessary arrest, physical injury or trauma, and/or avoidable involuntary detention.

b.    *Second,* the City, through the policies, practices and procedures described above, uses "criteria or methods of administration" that substantially impair the

accomplishment of the 911 program's essential purposes with respect to individuals with mental health disabilities. *See* 28 C.F.R. § 35.130(b)(3). The training and past performance of police officers dispatched to handle mental health emergencies establish that their presence creates a substantial risk that they will exacerbate, rather than alleviate, an individual's mental health emergency. As a result, the City administers its 911 program in a manner that denies people with mental health disabilities the type of effective services for mental health emergencies that the program exists to provide, and in fact provides for physical health emergencies.

c.  *Third*, the City has failed to make reasonable modifications to its policies, practices, and procedures governing the 911 program's emergency health response that would afford individuals with mental health disabilities equal access to this program. *See* 28 C.F.R. § 35.130(b)(7)(i). Sending trained behavioral crisis teams to respond to mental health emergencies would not fundamentally alter the nature of the City's 911 program. Indeed, the City has recognized and previously attempted to implement just such a program, out of recognition that people with mental health disabilities were not receiving the benefits of the 911 program's emergency health response.

111.    As a direct and proximate result of the City's illegal discrimination, Plaintiffs and their members and constituents have suffered and continue to suffer discrimination, denial of equal access to and an equal opportunity to benefit from, the City's 911 program, denial of reasonable modifications to facilitate equal access to the City's 911 program, and a substantial risk of, or actual exposure to, adverse outcomes, including but not limited to arrest, criminal charges,

detention, police use of force, physical injury, involuntary hospitalization, and emotional pain, suffering, and trauma.

## CLAIM II

### Section 504 of the Rehabilitation Act, 29 U.S.C. § 794

*(Discrimination on the Basis of Disability by a Recipient of Federal Financial Assistance)*

112.    Plaintiffs reallege and incorporate by reference the allegations set forth in each foregoing and succeeding paragraph as though fully set forth herein.

113.    Section 504 of the Rehabilitation Act of 1973 prohibits discrimination against people with disabilities by any program or activity receiving federal financial assistance. Under Section 504, otherwise qualified individuals with disabilities may not be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any such program. 29 U.S.C. § 794(a).  A program or activity includes "all of the operations of a department, agency, special purpose district, or other instrumentality of a State or of a local government." 29 U.S.C. § 794(b)(1)(A).

114.    The City of Worcester receives "[f]ederal financial assistance" within the meaning of 29 U.S.C. § 794(a).

115.    The City's 911 program is a single "program or activity" within the meaning of Section 504. *See* 29 U.S.C. § 794(b)(l)(A)–(B).

116.    Plaintiffs are "persons aggrieved" within the meaning of Section 504.  *See* 29 U.S.C. § 794a(a)(2).

117.    Section 504 prohibits covered entities from providing aids, benefits, or services in such a way that denies qualified persons with disabilities the opportunity to participate or benefit from the aid, benefit or service; does not afforded qualified persons with disabilities an equal

opportunity to obtain the same result as that provided to others; or otherwise limits the enjoyment by people with disabilities of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service.  28 C.F.R. § 41.51(b)(1)(i), (ii), (vii).  Further, Section 504 prohibits a recipient of federal financial assistance from using methods of administration that defeat or substantially impair accomplishment of the program's objectives. 28 C.F.R. § 41.51(b)(3)(ii).

118.    The City, through its 911 program, discriminates based on disability, in violation of Section 504, as follows:

a.    *First*, the City's 911 program employs an unequal and ineffective emergency response that discriminates against people with mental health disabilities.  The City's policy, practice and procedures are to respond to calls for physical health emergencies by sending paramedics and EMTs who are trained and equipped to provide an adequate health emergency response, while, by contrast, responding to mental health emergencies by sending armed police officers who are not qualified mental health professionals capable of providing on-site mental health assessment, stabilization, emergency treatment, and referral to individuals experiencing a mental health crisis.  The City's discriminatory actions have resulted in, and continue to result in, ineffective, unequal, inappropriate, and even harmful emergency interventions for people with mental illness, including escalations and exacerbations of mental health crises, unnecessary arrest, physical injury or trauma, and/or avoidable involuntary detention.

b.    *Second,* the City, through the policies, practices and procedures described above, uses "criteria and methods of administration" that substantially impair the

accomplishment of the 911 program's essential purposes with respect to individuals with mental health disabilities. *See* 28 C.F.R. § 41.51(b)(3)(ii). The training and past performance of police officers dispatched to handle mental health emergencies establish that their presence creates a substantial risk that they will exacerbate, rather than alleviate, an individual's mental health emergency. As a result, the City administers its 911 program's emergency health response in a manner that denies people with mental health disabilities the type of effective services for mental health emergencies that the program exists to provide, and in fact provides for physical health emergencies.

c.    *Third*, the City has failed to make reasonable accommodations and/or modifications to its policies, practices, and procedures governing the 911 program's emergency health response that would afford individuals with mental health disabilities equal access to this program. Sending trained behavioral crisis teams to respond to mental health emergencies would not fundamentally alter the nature of the City's 911 program. Indeed, the City has recognized and previously attempted to implement just such a program, out of recognition that people with mental health disabilities were not receiving the benefits of the 911 program

119.    As a direct and proximate result of the City's actions in violation of Section 504, Plaintiffs and their members and constituents have suffered and continue to suffer from discrimination, denial of equal access to, and an equal opportunity to benefit from, the City's 911 program, denial of reasonable modifications to facilitate equal access to the City's 911 program, and a substantial risk—or actual exposure to—adverse outcomes, including but not limited to

arrest, criminal charges, detention,  police use of force, physical injury, involuntary hospitalization, and emotional pain, suffering, and trauma.

## VI.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request this Court:

A.    Issue a declaratory judgment, pursuant to 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57, declaring that the City's 911 program violates Title II of the ADA, 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794;

B.    Grant Plaintiffs permanent injunctive relief requiring, at a minimum and within a limited and reasonable period of time, that the City, their agents, employees, and those persons acting in concert with it implement and operate a 911 program that provides equally effective responses to physical health emergencies and mental health emergencies and ensures that mental health professionals are the default first responders for typical mental health emergencies;

C.    Order the City to pay Plaintiffs' costs, expenses, and reasonable attorneys' fees incurred in the prosecution of this action, as authorized by 42 U.S.C. § 12205, 29 U.S.C. § 794(b), and other applicable laws; and

D.    Order such other relief as the Court may deem just and proper, including such orders as may be necessary to effectuate and implement the foregoing.

Dated: March 16, 2026

Respectfully submitted,

s/ Steven J. Schwartz
Steven J. Schwartz (Bar No. 448440)
Mona Igram (Bar No. 562986)
Max Lapertosa (*Pro Hac Vice* application pending)
CENTER FOR PUBLIC REPRESENTATION
5 Ferry St., No. 314
Easthampton, MA  01027
(413) 966-1510
Email:  sschwartz@cpr-ma.org
　　　　migram@cpr-ma.org
　　　　mlapertosa@cpr-ma.org

Tatum Pritchard (Bar No. 664502)
Justin Woolf (Bar No. 696771)
DISABILITY LAW CENTER, INC.
11 Beacon St., Suite 924
Boston, MA  02108
(617) 723-8455
Email:  tpritchard@dlc-ma.org
　　　　jwoolf@dlc-ma.org

James S. Rollins (Bar No. 569422)
Melissa Nott Davis (Bar No. 654546)
NELSON MULLINS
One Financial Center, Suite 3500
Boston, MA  02111
(617) 217-4700
Email:  james.rollins@nelsonmullins.com
　　　　melissa.davis@nelsonmullins.com